Who pleases the Court, Attorney Robert Mitchell, on behalf of Ms. Riser, who is with us here in the courtroom today, located at Council Table, is my paralegal. This is a case involving credit reporting of a medical debt collection. The trial court found that the reason that it was acceptable and that there was no violations was twofold. One, Ms. Riser couldn't prove that her infant daughter was covered by Medicaid, and two, Medicaid didn't pay. I have two documents to refer to, if the Court would like. I've got copies for the Court, or no? Okay. The first document is ER 569, and what this document shows us is several things. One, it lists the infant child. It is an EOB, which is an explanation of benefits from the Department of DSHS, which is Medicaid. It lists the infant child. It lists the date of service. It lists a $25,435 payment. So from this document, what we know for certain is that this infant was covered by Medicaid. You cannot argue that a child is not covered by Medicaid when Medicaid made a $25,000 payment. If we skip down, this document also includes the stated debt that was credit reported, $2,790.37. Now, the argument was because Medicaid didn't actually pay the $2,790, that that means that it wasn't covered. That is simply not how Medicaid works. If you look down on the document, it has a code that explains what was not covered, and it's entitled non-covered charges. The code for that is 96. If we look up in the other adjustment column, there is one code that relates to 96. That charge is $23.44. So the only portion of this bill that wasn't covered by Medicaid, and it's specifically stated as a non-covered charge, is $23.44. The remainder of the $2,790 was covered by Medicaid. It wasn't paid by Medicaid because there were billing discrepancies. Now, the way that Medicaid works is fairly simple. If it's a covered Medicaid service, it is prescribed by statute that Medicaid covers that service. If the hospital wants to receive payment for that service, the hospital needs to bill correctly. But if the hospital fails to bill correctly, the statute is very clear that the hospital is not entitled to then bill the patient. That's called balance billing, and it is illegal and is prohibited. And that's exactly what occurred in this case. The hospital billed Medicaid. Medicaid said, yes, these are covered services, and we will pay you for them if you bill us properly. Somehow the hospital from that decided that these weren't covered services and that Ms. Reiser owes them. If I can ask you about this document. For the other services, it has a code N329, missing, incomplete, invalid patient birth date. Yes. And is there anything record? I couldn't find it. I mean, who provided the incorrect patient date of birth? So thank you for that question because I feel like the trial court was confused about that. These communications are specifically between the hospital and DSHS. If you look at the address that this was mailed to, it was sent to the hospital. Medicaid patients do not get involved in their own Medicaid billing. They're not part of the process. And Ms. Reiser was not part of this process. Ms. Reiser presented to the hospital. She personally was covered by Blue Cross Blue Shield and Medicaid because of her age. She was covered by her mother's Blue Cross Blue Shield policy. This issue here is specifically to her infant daughter. And what the trial court held was that, well, it's possible that Blue Cross Blue Shield provided coverage for the infant. That's not possible. The infant is the granddaughter of the policyholder. And there is no EOB or any other information in the file that suggests that that infant was covered by her grandmother's Blue Cross policy. The only evidence that we have in the record is that that infant was covered by Medicaid. And the only portion of the Medicaid bill that was not covered was the 2344. Yeah, but I'm still trying to figure out, and maybe it's not clear in the record, who – obviously Medicaid thought the date of birth is invalid or incomplete, but who was responsible for that? Who was responsible for providing that information to Medicaid? Yes. The hospital, and that's why it's – Well, I guess I know the hospital is the one that provides it, but was it Ms. Reiser who provided that accurate information, or do we not know? I mean, is it something she put the wrong date or didn't provide it, or did the hospital make an error in transmitting it? Is there anything in the record that shows what caused that error? There is nothing specific in the record that says that, but I think that we can glean from the circumstances themselves, Your Honor, exactly what happened. The child was born at this facility, and this bill was submitted two days later. Ms. Reiser did not submit the bill. So if anyone got the date of birth wrong, it was actually the facility where the child was born. Ms. Reiser doesn't check into the hospital and say, hey, here's my Medicaid, and I want you to cover services for these specific things. She presents her Medicaid card, which they clearly had, because they billed Medicaid and got paid $25,000. If there was a discrepancy in the date of birth, that is not paperwork that Ms. Reiser would have filled out. It's paperwork that the hospital would have filled out, and it's quite shocking that they got it wrong, given the fact that the child was born there and the bill was submitted just a day or two later. But there is nothing in the record that would suggest that Ms. Reiser either intentionally or unintentionally wrote down an incorrect date of birth for her daughter that she had just given birth to. On a similar note, is there anything in the record that shows who was at fault, in terms of, I guess, the mailing address? Because later on, the hospital tries to get additional information from her, but I guess it's returned back to the hospital as undeliverable. Is there anything in the record that shows what went wrong, what happened there? If I can direct the Court's attention to ER 577, that is the billing notes, and it's unclear to this day whether these start with the provider and go to the collection agency when it's referred, if this is an amalgamation of both of theirs. But it says that they sent bills, and those bills were returned. And that's part of what the problem here is, Your Honor, is that when this was assigned to the collection agency, the collection agency did a search. They found out where Ms. Reiser actually resided. There was a letter that was returned because it was a bad address. They knew where she lived because they did a search through a credit reporting agency and turned around and sent the second letter to the same bad address rather than the good one. Ms. Reiser did not find out about this bill until she saw it on her credit report. And she saw it on her credit report because she was trying to purchase the property that her and her children lived at. And in order to do that, she had to take out a small loan, and that's when she learned that not only this debt but 11 other debts were being reported by Central on her credit report. Had she known prior, I think the record's clear about what would have happened. As soon as she found out about this, she jumped on it. She talked to the hospital. She submitted a dispute to the credit reporting agency. And this was eventually charged off because she didn't owe it. She did everything that she could. She submitted packages, charity care packages. She even called the attorney general. Can you explain that you're saying that the hospital knew the correct address, and how would the hospital know that? From these notes, it is difficult to know exactly what the hospital knew about her correct address. What we know is that they mailed documents supposedly to an address that were returned, Do we know what that address was or whose fault that was? Is the court questioning whether or not she had given a false address? An incorrect address. I think what happened was that she moved after she gave birth. Do we know in the record what happened? From the record? I couldn't tell, so I'm just asking you. I don't believe so. I don't believe it's in the record, Your Honor. I believe they sent it to her old address that she enrolled at the hospital with, and I don't think that she lived there anymore. Did I understand correctly that your argument? I thought your argument in some ways didn't turn on, because your argument was that she just had no obligation whatsoever to provide any of this information to the hospital? Oh, absolutely not, Your Honor. Before she even gave birth, when she checked in, she gave them her Blue Cross coverage, and she gave them her Medicaid coverage. That's why this EOB shows that Medicaid paid $25,000. She provided all of that information to them. Our position is that because she provided Medicaid, the hospital knew that she was covered by Medicaid, and this is a bill that was covered by Medicaid, they can't bill her. It's called balance billing, and it's not allowed. I'm trying to figure out on the address. You said that you think it was a prior address that she moved after the baby was born, or what happened under the record? Does the record? It doesn't reflect that, Your Honor. Okay. What we do know from the record is that when Central became involved, when this account was assigned to Central for collections, Central was able to obtain the correct address, and they mailed the collection letter to the wrong address anyway. So, again, this case turns on the question of whether or not there is an inaccuracy, and from these official government documents, what it shows is that at most she owed $23.44. What was credit reported was almost $2,800. That is an incorrect balance. These documents show that there's no way that she owed that balance. And so the question is this. What happens when a medical debt collection agency credit reports a medical debt in a balance that's not appropriate, that's inflated, that's inaccurate? And the Fair Debt Collection Practices Act is a strict liability statute that just doesn't provide for that. If it happens, they're strictly liable. There is one affirmative defense available, and it's called the bona fide error defense. It wasn't even pled in this case. So the court doesn't even need to address it. There are a lot of excuses and reasons why this happened, but the fact of the matter is the collection agency credit reported an erroneously inflated balance. It was inaccurate. As far as TransUnion is concerned, TransUnion failed or refused to follow the very first, most important step of the Fair Credit Reporting Act. The statute says that they have a grave responsibility to assure maximum possible accuracy. And to do that, they have a responsibility to communicate consumer disputes to the companies that are credit reporting those accounts. TransUnion in this case unapologetically admits that they just didn't do it. They waited until the end of the road and said, well, if we had done that, it might have created a legal dispute. Those are hypotheticals that don't, they're not proper for court. We deal in law and facts, and we don't know what would have happened. What we do know from Central's deposition is that if they had received the dispute from TransUnion, they would have investigated it. That's what we know for certain. They were deprived of that opportunity. Carvalho tells us that the furnisher is in the best position to investigate and adjudicate these disputes. That cannot happen. We can't even give effect, full credit to Carvalho, if TransUnion doesn't actually communicate the dispute to the furnisher. It deprives everyone in the- So, in your view, TransUnion, I take it, would not have had to research any legal defenses or draw any legal conclusions to report this information? No, no. And if this case had followed the path of Carvalho, where the consumer disputed to the credit reporting agency, the credit reporting agency actually communicated that dispute to the furnisher, and if Central had come back and said, no, we have investigated this and verified that it's accurate, in that posture, I don't think there would be a claim against TransUnion. But that didn't happen. So the claim against TransUnion is not, hey, TransUnion, please fix all these problems with this account. It was just, hey, TransUnion, please communicate this dispute to Central so that they know and so that I have rights under the Fair Credit Reporting Act. But by TransUnion depriving Ms. Reiser and Central of the ability to investigate this dispute, it left Ms. Reiser with absolutely no cause of action for having her credit destroyed to the point that it caused her to be temporarily homeless. If they don't have notice, then they are not liable under the Fair Credit Reporting Act. And that's TransUnion's fault that she was deprived of a cause of action. So what we have here is a bizarre result where a person who had two insurances, Blue Cross Blue Shield for herself, Medicaid for herself, Medicaid for her child, she provided all of that information to the hospital. The hospital was under a consent decree where they knew that they were supposed to be doing a better job. There was charity care. That person left the hospital and had her finances destroyed anyway. It shouldn't stand that that's just okay because it might have created a legal dispute. And Central, essentially, for credit reporting the original incorrect balance, doesn't have a defense because the balance was incorrect, however you view these documents. Central knew their notes. 577 says insurance verification complete for Medicaid provider one. They knew that Medicaid was the provider one for this infant. Subscriber coverage is active. Details show 276693 allowed, 2344 not allowed. And Washington Medicaid is mentioned five times in these collection notes. So they knew that there was Medicaid coverage. They knew that Medicaid was the primary coverage for this infant. They knew that the only amount that wasn't allowed was 2344. They credit reported this at their own peril, and there is no defense for that under the Fair Debt Collection Practices Act. It's an attempt to collect an amount that's not owed. So I will reserve my remaining 15 seconds for... We'll give you two minutes. Okay. Additional two minutes. Thank you, Your Honor. I understand the appellees will share your time, eight minutes and seven minutes. Good morning. I'm Camille Nicodemus, and I'm representing Defendant Appelee Credit Reporting Agency, TransUnion. The detail that was just described by counsel for plaintiff with regard to the Medicaid statutes, the interpretation of those statutes, references to illegal billing processes, and so on, make it very clear that plaintiff's claim in this case rests wholly on a defense, a legal defense to the debt, not a factual inaccuracy on the debt, but a legal defense. Simply stating that part of the hospital bill was attributable to her and the rest was not due to the application of Medicaid or some consent decree is still, in fact, an assertion of a legal defense to the debt, which credit reporting agencies like TransUnion are just simply not obligated and not equipped to investigate. Simply because there was an outcome in this case in which plaintiff does not have a cause of action against central portfolio does not mean that the clear strictures of the Fair Credit Reporting Act and the case law in this and other circuits interpreting it are wrong. Plaintiff, in fact, did not dispute directly with TransUnion in this case. Now, TransUnion was let out on a motion on the pleadings, so we really only need to look at what was alleged in the complaint. But the case did proceed to discovery, and in that discovery it was uncovered that plaintiff did not dispute with TransUnion. She contacted a credit reporting agency called Lifelines, a credit repair organization called Lifeline Solutions, in connection with her bad credit. In addition to this central portfolio account, she had a number of other unpaid bills, and she went to this organization to try to clean up her credit. Oftentimes those organizations are not really doing the best service to consumers. They wrote letters to TransUnion, and when those letters come from a third party and they do not come directly from the consumer, TransUnion has no obligation to investigate. Can you address your friend's point that there was a kind of chain reaction here because TransUnion didn't investigate, and the furnishers weren't able to do their job, et cetera? Can you address his point there? I think it's more practical, not necessarily legal in the sense of where you're relying on Carvalho, but they create kind of a chain reaction to the detriment of Ms. Reiser. Sure, absolutely. And this court in Carvalho and also in Gross made it clear that the CRAs can't be held responsible for what plaintiff's obligation is, which is to contact the furnisher of the debt directly. The central portfolio account was reporting on her TransUnion credit file. It had a telephone number. It had an address. And in addition to not directly disputing with TransUnion, the consumer did not directly dispute with central portfolio. Now, the Fair Credit Reporting Act provides for this direct dispute to central portfolio. She chose not to do that. The case law points out that oftentimes the furnisher, particularly in these legal dispute cases, is in the best position to dig into that and find out what happened, to go back maybe to the hospital to look at the documents, to take a review of what their rights and obligations are to collect Medicaid debt, Medicare debt in the State of Washington. That's not something TransUnion could do. So there's a very logical and good reason for the courts noting that this is plaintiff's best avenue. It's because for two reasons. Number one, that's the best way to get to the bottom of it. Contacting TransUnion as a go-between on a legal dispute with the level of complexity obvious in this case would not serve plaintiff's interests whatsoever. And there's a very good reason for the Fair Credit Reporting Act is not a strict liability statute. TransUnion can escape reporting inaccurate information if it used reasonable procedures. And TransUnion can escape faulty procedures if it reported factually accurate information. Here it reported factually accurate information. Plaintiff may very well have what she claims is a legal defense. The court ultimately at the end of discovery did not conclude that, concluded that in fact the debt was not covered and that it was ultimately discharged under a charitable gift of the hospital. They took a look at the debt and under their charity program. But all TransUnion had to do is just state that it's a dispute. It didn't have to research the dispute. It didn't have to determine it was a valid dispute. I mean, why isn't that just a factual matter that she was disputing? Well, a couple things. First, in this case let's not forget that she didn't dispute to TransUnion. A letter was written from a credit repair organization and the law provides that TransUnion does not have to reinvestigate that. TransUnion also doesn't have to investigate frivolous or irrelevant types of disputes that come to them that are repetitive. If the account's not on file, if there's some piece of information that the consumer is disputing, like an address or a phone number, those are not actionable. Those are not credit information that could be accurate or inaccurate. There are numbers of different circumstances under which the consumer reporting agency is not going to contact the furnisher directly, and these very complicated legal disputes are one of them. And the reason for that is simply that if the investigation cannot uncover whether or not this legal defense existed, then it simply isn't a factual dispute. There are other factual disputes that if the consumer reporting agency conducted a reinvestigation and didn't uncover it, you know, one can say, well, this was not – there are courts that have used the standard readily and objectively verifiable as opposed to a legal dispute, right? If it's something that can't be uncovered through reasonable, normal procedures, then they cannot be held liable for that. And in this case, plaintiff's issues, plaintiff's damages, plaintiff's problem are those of her own making. She did not contact Central Portfolio, and she also did not contact TransUnion directly. And TransUnion had no obligation to research or investigate this very, very complex legal issue that involved statutes, consent decrees, obligations between the State of Washington, between the hospital itself, and plaintiff's obligations. Plaintiff had certain obligations as well, just based on things that Plaintiff's counsel is saying and what the record ultimately looked at – looked like. But the motion for judgment on the pleadings that was granted in TransUnion's favor was granted based on the clear-cut allegations in plaintiff's complaint. And those allegations clearly stated she had a legal defense to this debt. That is her claim. And the long-standing precedent in the Ninth Circuit, in the First under DeAndre, in the Seventh under Deenan, in the Tenth under Wright, in the Second under Sessler and Maida, is that this is not actionable. It is – you cannot hold TransUnion liable for a – any – anything having to do with the reinvestigation at all. The language in Carballo and Gross is very clear. You don't reach the question of the reinvestigation. And the district court very correctly applied those facts to this case. Carballo is virtually the same set of facts. Again, a medical debt. Again, a complaint that she did not have a debt. One other quick thing, plaintiff's counsel refers to the grave responsibility in the Fair Credit Reporting Act, misstating it as a grave responsibility to forward all disputes to the furnisher. In fact, it's a grave responsibility to use reasonable procedures to assure maximum possible accuracy. It does not hold that specific requirement. And to parse out or take apart a requirement to furnish the dispute, to take that away from the obligation to reinvestigate, which does have exceptions to it and also is by its own language – the Fair Credit Reporting Act limits reinvestigations to a dispute of factual – to a dispute of inaccurate information, not a dispute that I have a defense to that information. And so not only does Carballo and its progeny hold that, but the language of the Fair Credit Reporting Act itself, which Congress carefully crafted with regard to these is the cause of her issues in this case. Great. Thank you. Thank you. May it please the Court, I'm John Rossman. I'm an attorney with the Rossman Attorney Group, and I represent Central Portfolio Control. My client is a small company located in the Prairie of Minnesota. It's actually located in Eden Prairie, Minnesota, and it's a family-owned business. It's been around for 25 years. I've represented Central Portfolio Control since 2000, so I'm proud to be a Minnesotan as well. When I started representing this company in 2000, it was about 10 employees. Today, it probably has 135. I'm going to see if I can get you to focus on something.  Can you walk me through, as quick as you can, what your client did to – well, not just your client, but the hospital – to try to contact the plaintiff in this case? Yeah. Because I want to – because it seems like, to the extent that you're saying the plaintiff had a responsibility to coordinate with us and work with us, I'm trying to figure out whether there's a disputed issue of material fact about that that would have prevented a decision at this point in the case, or whether or not there's undisputed facts that are sufficient to justify the district court's order. So, specifically, what did the hospital do, and what did your client do? Thank you, Your Honor. Yes, and I can walk through the chronology on that. So, on October 23, 2015, about nine years ago, earlier this week, this debt – the account was incurred, and this was, as has been identified, a debt for the infant. It's shown that the Medicaid was denied a few days later. One of the notes that we talked about – Their point is that – well, I mean, the fact that you billed Medicaid for it would seem to – you could assume that she provided some sort of Medicaid card or something in order for you to have done that. So, she provided something in that respect. There's no doubt about that. However, it's clear from the documents produced that there was no Medicare coverage for the child until December 1, 2016. And if you look at the Explanation of Benefit document, which is located at ER 613, it's a document that was produced by plaintiff, and it specifically identifies the infant, and it shows the eligibility start date for the infant as December 1, 2016. So, to the extent there's an argument that there was no Medicare coverage, it's clear from the document produced by plaintiff that there was no Medicare coverage until nearly a year after this debt was incurred. Furthermore, with respect to the address – you'd asked about the address and what attempts were made to communicate with the consumer, and there's a reference to this ER 577. And in that document – let's put it here – it specifically references the efforts that were made by the health care provider to communicate with the consumer. And there's a note here – it's dated August 2021 – that states that the health care provider was unable to communicate with the consumer. And I'm going to get the exact quote here. Did you say August 2021? You're on 577? It's August 20, 2016. There's a note there that says – I apologize. So, that was August 20, 2016 that my client – or the health care provider, rather – was trying to communicate with the consumer. I want to point out one other document, and that is document ER 610. And ER 610 demonstrates that on July 14, 2016, the infant was at the hospital for treatment. So, like a month before – was it one month and five days before – the hospital tried to send this notice to the guarantor, the appellant. The appellant was at the health care provider receiving services for the infant. Now, I have two adult daughters now, but when I presented them for treatment in the past, one thing that the health care provider will ask is, please verify this information. So, what we do know from the record is that July 2016, the patient is at the hospital. August 2016, the mail is undeliverable. We don't know whether she was asked to verify. We do not. We do not, but we know that she was at the hospital at that time because we have that in the record here. As far as – yes. Can you address – you've kind of done it, but can you address the same question I asked your friend on the other side? Is there anything in the record that shows who was at fault for – I mean, to me, it's even unclear why some of these claims are denied. It was maybe incorrect date of birth, or maybe they thought – Medicaid thought there was Blue Cross coverage, other third-payer coverage. It's not clear to me from the record, but who was at fault here? Is there anything in the record that shows – maybe it was the hospital that provided the wrong date of birth, maybe it was Ms. Reiser. Is there anything that shows what happened here that caused this error? Thank you, Your Honor. The district court stated in its order that there isn't any evidence the hospital made a mistake. I've gone through the record. I think we've all gone through the record. I just – it's unclear as to exactly what happened. What we do know is that the record reflects that the infant did not have this Medicaid coverage until more than a year after the debt was incurred. So we can argue about whether it was a correct code, whether it was pre-MARA coverage, whether it was Medicare or Washington Apple Health, but the document that we have evidence that there was no coverage whatsoever for Medicaid at that time. I want to point out one other thing on ER 610. What is the significance of the document? Unfortunately, I don't have the ER site, but it said something along the lines of, Medicaid has allowed charges of $2,700. What does that document signify? So that was a note, as I understand it, that was a note from the hospital health care provider's billing system where someone was talking to Medicare or perhaps on the website writing down information. That wasn't an approval. That was information that the health care provider received. The evidence regarding whether or not there was Medicaid coverage is this document that I referenced, which says that, no, there was no Medicaid coverage until nearly a year later. One other thing, Your Honor, I'd like to point out is that there was some insurance coverage around that time. If we look back at this ER 610, this document I referenced a second ago, it also references a hospital visit from December 30, 2015. And if you look on the right-hand side, it talks about an insurance payment of, excuse me, $317.44. So here we have about two months after the infant was born and the health care bill at question was incurred, we show that there was some type of insurance coverage that the hospital received a partial payment on. I apologize, I'm out of time. If you want to continue, please. Thank you, I appreciate it. So with respect to the address, it is correct that my client sent the same or sent a collection letter the same address. I'd like to posit to the Court that it's not unfathomable that a person could have the same address twice. Certainly this was a person who was on her mother's insurance policy at the time. It's possible that a person could move in with their parents and then move somewhere else. So I don't think it's inconceivable that we sent, my client sent two collection letters to the same address. One was returned as undeliverable. It is possible that second letter could have been received. It wasn't, I understand it wasn't, but it's not inconceivable that the address was. There was something about phone, was it you all or the hospital that tried to make phone calls? So my client did try to make a phone call, and as I understand the hospital also tried to make a phone call from the record, but there was no connection. One thing about phone calls that I want to point out, Your Honor, is that when plaintiff did pull her credit bureau, the credit bureau report has the information from my client right there. She could have contacted my client in May 2020 when she had her credit bureau and said, hey, what's going on? Instead she hired this credit repair organization that sent this odd dispute letter. You know, so there was an opportunity there. The information was there. So when we look at what are the responsibilities to communicate, there is also some responsibility there to at least take some steps. I have nothing further. Thank you. Thank you. Very briefly, I'll be very brief. What we've seen here today is that there are too many genuine issues of material fact remaining in dispute. There are just too many questions to be answered that need to be developed through discovery, and they need to be presented to a jury. This record is replete with confusion. My opposing counsel states that. Can you give me some specifics as to what creates an issue of a genuine material fact about your client having sort of done something to communicate with or coordinate with or some sort of with that? It sounds like she may have provided a Medicaid information, but it also sounds like that Medicaid information, there's evidence in the record that Medicaid information, she didn't have Medicaid for the first year is what they're saying. What about, it does appear like she, there was some insurance coverage. So what is information, what is there in the record that there was any communication? Because I understood you to be arguing that she had no responsibility. When I looked at page three of your opening brief, basically it seemed like you were saying we had no response. That was between the hospital and Medicaid. That wasn't to coordinate this. So what did you have that she communicated with them? It's the question that the panel has asked repeatedly, and that's whether or not she ever received notice that she had a bill. What would a jury think about that? If Jim Arizer provided her insurance coverage, gave birth to a child, bills were paid, she left and never even knew that there was a remaining bill, what are her responsibilities? And that's something for a jury to decide. Did she act reasonably? Did the defendants act reasonably? That's what a jury needs to decide. So there are statements here that she didn't have Medicaid coverage for the baby until a year later. Well, this EOB 569 specifically says that Medicaid paid over $25,000. It's not possible that she didn't have Medicaid coverage if Medicaid paid over $25,000. Perhaps a very basic question that I'm not familiar with. So for the birth of a baby, who is charged? Is it the mother or the baby? For the first 21 days, it always falls under the mother's guarantor number. And that is the Erin Act. Washington State has a specific RCW. It's called the Erin Act, and it says that if the mother has any form of Medicaid, that baby is covered under her guarantor number. So it doesn't matter whether the baby was under Medicaid coverage, the paperwork wasn't done, because it would be billed to the mother who gave birth. Exactly, Your Honor. So for the first 21 days under the Erin Act, that baby is automatically covered under the mom. Then the mom has a responsibility to go enroll that child in Medicaid. But for the first 21 days of that baby's life, it is absolutely covered under the mother's guarantor. I think that might be why we got into the issue of the date of birth. I think that the guarantor number was Ms. Reiser's guarantor number, and I think they put the baby's date of birth in there, and I think that's why Medicaid said, hey, this date of birth issue, you've got to clear this up, and then you'll get paid for these. But this explanation of benefits, it's from Washington State DSHS to St. Joseph's. It specifically shows that the child had Medicaid coverage. I'm sorry. Yes, Your Honor. Point me again to where the $25,000, in the record it talks about Medicaid paying $25,000. It is ER 569. 59. 569, I apologize, 569. And up towards the top, it's Exhibit B, up towards the top it says payment information in bold, and underneath that it says that there was an EFT or a check written, and that was written on November 5th, 2015. Now, recall the baby wasn't born until the 23rd. They didn't leave the hospital until the 24th. So just shortly after they left the hospital, Medicaid made a $25,435 payment, and as you can see, the patient identification is the child's name, not the mother's name. So this is the baby's bill. Clearly she had coverage. You go down to the remarks below, the adjustments, and it says the only non-covered portion is a Code 96, and Code 96 relates to the 2344. So that's another genuine issue of material fact. Based on this, does Gemma Reiser owe 2344, or does she owe almost $2,800 for this bill? I assume there was. Was there a third-party discovery with the hospital to get documents and depositions here? There was limited discovery, Your Honor, yes. Now, that was for the Central case. TransUnion was a Rule 12 motion. With Central, we were able to engage in some discovery. We took some depositions, and there's no other discovery in the record that says that this EOB is incorrect. There's no other EOB in the record, and what counsel said about those collection notes is that those are basically hearsay upon hearsay. That's someone taking notes based on what the provider said to another company. So are they trustworthy? I don't know. I know that this DSHS document is trustworthy. I promised to be quick, and so I want to make one point or a couple points on it. You've exceeded your time that we already gave you, so make one quick point. Okay. TransUnion argues that they have no duty to communicate frivolous disputes or disputes from credit repair organizations. That is correct. However, in that circumstance, if they declare that a dispute is frivolous, they have to tell the consumer so that the consumer can redo the dispute and engage the process appropriately. In this case, there is no disputed fact that TransUnion never told Gemma Reiser or the company that furnished the dispute to TransUnion that it was frivolous, that it was from a credit repair organization. We're not going to do anything with this dispute. Statutorily, the only way that a credit reporting agency gets out of the responsibility of communicating the dispute to the furnisher is if they inform the consumer, and that didn't happen in this case. Unless there are any other questions, I will sit down. Thank you. Thank you both for a very helpful argument. The case has been submitted, and we are adjourned. Thank you.
judges: LEE, VANDYKE, THOMAS